IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br> vs.<br><br>ARBAB SALEEM,<br><br>   Defendant. | DOCKET NO. 3:21 CR 86 |

**Motion to Dismiss the Indictment under the Second Amendment**

Mr. Saleem pled guilty on October 22, 2021 to two counts of possessing a "firearm" as defined at 26 U.S.C. § 5845(a) without a permit, specifically a short-barrel shotgun and a silencer. On June 23, 2022, the Supreme Court announced a new framework for determining whether a law violates the Second Amendment. *See generally New York State Rifle & Pistol Assoc., Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022). The *Bruen* opinion has already begun to change the permissible regulatory landscape for firearm prohibitions. *See e.g., United States v. Quiroz*, Case No. 22-CR-104, Memorandum Opinion, Dkt. #82 (W.D. Tx. Sept. 19, 2022) (holding that 18 U.S.C. § 922(n)'s prohibition on those under a felony indictment from obtaining a firearm violates the Second Amendment and ordering the indictment's dismissal).

1

In *Bruen*, the Court held that if "the Second Amendment's plain text covers an individual's conduct," the Constitution "presumptively protects that conduct." *Id.* at 2129-30. And the government bears the burden of rebutting that presumption by demonstrating that the challenged firearm regulation is consistent with American tradition, which requires pointing to similar regulations that were widespread and commonly enforced when the Second Amendment was adopted. *Id.* at 2131-32.

Under *Bruen*, the two counts to which Mr. Saleem pled guilty should be dismissed, because these regulations burden his Second Amendment rights and there is no historical tradition supporting such regulations.

26 U.S.C. §§ 5861 & 5871; 18 U.S.C. §§ 921(a)(3)(C), (a)(6), & (a)(24); and 922(a)(1)(A) make it a crime punishable by up to ten years in prison for a person to "receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record," 26 U.S.C. § 5861(d), which includes, *inter alia,* "(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; … [and/or] (7) any silencer," 26 U.S.C. § 5845(a). 28 U.S.C. §§ 5821(a) & 5822 require any person "making" such a firearm to first file an application with the Secretary of the Treasury and pay a $200 tax. "Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law." 28 U.S.C. § 5822. The Secretary of the Treasury is given the power to exempt any firearm from these provisions if she finds that the firearm "by reason of the

2

date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." *Id.*

Under *Bruen*, exposure to up to ten years in prison for failing to file an application and pay a $200 fee infringes on Mr. Saleem's Second Amendment right to keep and bear arms. There is no "historical tradition" regulating these types of devices, and modern legislative enactments cannot supplant the historical meaning and liberty enshrined in the Second Amendment.

Under the Constitution, "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court found that the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. *Id.* at 570, 592, 624. The Court revisited the Second Amendment in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). There, it found that the Second Amendment was incorporated against the States by the Fourteenth Amendment and reaffirmed that "[s]elf-defense is a basic right" and "that individual self-defense is 'the *central component*' of the Second Amendment right…." *Id.* at 767.

Following these decisions, courts of appeals analyzed firearm regulations by using some form of means-end scrutiny, which weighed the government's regulatory interest against the individual's Second Amendment right. *See generally United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). But *Bruen* overruled these cases. *See Bruen*, 142 S. Ct. at 2127, 2138 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context"). And the Court

3

announced a new standard of review for Second Amendment challenges: first, the court asks if "the Second Amendment's plain text covers an individual's conduct" and if so, "the Constitution presumptively protects that conduct." *Id.* at 2126.

Under *Bruen*, to rebut this presumption of unconstitutionality, "the government may not simply posit that [a] regulation promotes an important interest[,]" but "[r]ather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. This "historical tradition" test requires courts to "consider whether historical precedent…evinces a comparable tradition of regulation." *Id.* at 2131-32. A handful of "outlier[]" statutes or cases from an small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. And even if certain statutes were widespread, they nevertheless fail to establish a historical tradition of regulation unless the record demonstrates that the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws that government relied on as historical precursors to its modern firearm regulation, because the government "offer[ed] little evidence that authorities ever enforced [those] laws"). And if "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. Insofar as there are "multiple plausible interpretations" of an ambiguous historical record, the government fails to rebut the regulation's unconstitutionality. *See id.* at 2141 n. 11 & 2139 (an ambiguous historical record "is insufficiently probative to defend [a statute]").

4

*Bruen* emphasized – repeatedly – that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *see also id.* at 2127, 2130, 2141 n.11. Because the government cannot meet this burden, Mr. Saleem's possession of these devices is protected by the Second Amendment and the indictment against Mr. Saleem should be dismissed.

The Second Amendment's plain text covers Mr. Saleem's conduct. It protects the right of "the people" to "keep and bear arms." Here, a short-barreled shotgun and a silencer fall under the "arms" protected by the Second Amendment.

"[T]he Second Amendment protects the possession and use of weapons that are 'in common use[,]'" which includes short-barreled shotguns like that possessed by Mr. Saleem. *Bruen*, 142 S. Ct. at 2128. "Short-barrel firearms, unlike modern 'assault weapons, did exist at the time of the Second Amendment's drafting and ratification. James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 496, 503 (2017). A blunderbuss, which is a firearm "boasting very short barrels," existed in the 18th century and the American Revolution Institute even has "a type that was carried by British troops during the American Revolution."[1]

Likewise, a silencer is covered by the Second Amendment as either part-and-parcel of a firearm or a reasonably necessary accoutrement. "Arms" includes "any

---

[1] The American Revolution Institute, *Blunderbuss, the 'Thunder Box' of the Battlefield*, available at < https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/> (last accessed 10/17/22).

5

thing that a man…useth in wrath to cast at or strike another" and to "bear arms" means to "wear, bear, or carry…for the purpose…of being armed and ready for offensive or defensive action in case of conflict with another person." *Heller*, 554 U.S. at 581, 584. Since silencers are used to "cast[ ] or strike" a bullet, they fall under the Second Amendment's "Arms."

But, even if not "arms" in and of themselves, they qualify for Second Amendment protection as a reasonably necessary accoutrement, which renders a firearm useful and function. At the founding, "arms" included the firearm *plus* the "proper accoutrements that rendered that firearm useful and functional. *United States v. Miller*, 307 U.S. 174, 182 (1993). Accoutrements during the founding included things like brushes and wires to clean the gun, holsters, and even wax to protect the firearm from rain. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 497 (2019).

Firearms can involve sound levels that are dangerous for the user's health. *Compare* 29 C.F.R. § 1910.95 (OSHA has peak limit of 140 decibels SPL ("sound pressure level") *with* Deanna K. Meinke et al., *Prevention of Noise-Induced Hearing Loss from Recreational Firearms*, Semin Hear. 38(4): 267-281 (Nov. 2017) ("Peak sound pressure levels…from firearms" can "range from ~140 to 175 [decibels]"). Indeed, the CDC recommends the use of silencers to reduce the noise experience

users experience at shooting ranges."[2] Silencers thus fall under the Second Amendment's protection.

The first commercially available silencer, the Maxim Silencer, was patented in 1909 using the same noise reduction engineering as mufflers for internal combustion engines. Emily Rupertus, "Suppressors: The History," NRA Blog (Oct. 5, 2016) (available at https://www.nrablog.com/articles/2016/10/history-of-suppressors/).

> It was regularly advertised in sporting goods catalogs where it was available for mail order. The Maxim Silencer was marketed to all sportsmen and intended to enhance the shooting experience by reducing the risk of hearing damage and noise pollution….
>
> Theodore Roosevelt was a fan of the Maxim Silencer and had one mounted on his Winchester 1894 carbine. His son Archie once related that 'Father favored the silencer for early morning hunting expeditions to eliminate varmints around Sagamore Hill. He felt it best not to wake the neighbors.' Probably for the best, as Roosevelt's neighbors included such New York luminaries as the Vanderbilt, Whitney, and Tiffany families.

*Id.*

The National Firearms Act of 1934 did not ban silencers, but rather imposed a licensing requirement and a $200 tax, the equivalent of over $3,500 in today's dollars. *Id.* That $200 tax is still in place today, and the result of the diminishing cost in real dollars coupled with advancements in technology has resulted in the

---

[2] Brueck SE, et al., National Institute for Occupational Safety and Health, *Health Hazard Evaluation Report: Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges during Tactical Training Exercises* 14, HHE Report 2013-0124-3208, *available at* < https://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf> (last accessed 10/17/22).

7

increased popularity of silencers. *Id.* Between 2010 and 2015, the number of licensed silencers in private hands from went from under 300,000 to over 900,000. *Id.*

Because "the Second Amendment's plain text covers [Mr. Saleem's] conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

> [T]he Second Amendment's … reference to 'arms' does not apply only to those arms in existence in the 18th century. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.

*Id.* at 2132 (quoting *District of Columbia v. Heller,* 554 U.S. 570, 582 (2008)) (cleaned up).

The government must therefore establish that the statutory and regulatory requirements for owning a short-barrel shotgun and/or silencer are "consistent with this Nation's historical tradition of firearm regulation" to proceed with Mr. Saleem's prosecution. *Id.* at 2135. However, as the *Bruen* opinion points out, in colonial times the ownership of unusually small firearms was regulated only in regards to concealed carrying in public, and only for "eight years of history in half a Colony roughly a century before the founding." *Bruen,* 142 S. Ct. at 2144.

The ability of citizens to possess short-barreled shotguns and/or silencers upon paying a fee and filing an application is akin to the "surety laws" discussed in

8

*Bruen,* which the Supreme Court regards as indicating a general right to possess such weapons, demonstrating the founders' intent not to prevent such possession. *See id.* at 2149-50. Nor can the ease or difficulty of obtaining a permit save a regulation that impacts the Second Amendment right, *see, e.g., id.* at 2159-60 (Alito, J., concurring), particularly if the regulation "grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense" and fails to "employ objective licensing requirements." *Id.* at 2161-62 (Kavanaugh, J., concurring). This is especially true where individuals are reporting that ATF can take months or years to approve registration forms.[3]

The Second Amendment protects "the right of the people to keep and bear arms[,]" enshrining individuals' right to possess and carry firearms for self-defense. Because there is no historical tradition of prohibiting shotguns of a particular length or of accessories that make firearms more safe to use, the statutes and regulations at issue violate the Second Amendment, and the indictment should be dismissed.

---

[3] *See generally* NFA Tracking, Transfer Tracking, available at https://www.nfatracker.com/nfa-transfer-time-tracking/ (last accessed 10/17/22).

9

Respectfully submitted:

  s/ Peter Adolf
Peter Adolf
Assistant Federal Public Defender
North Carolina Bar No. 37157
Attorney for Arbab Saleem
Federal Public Defender, WDNC
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 375-2287 (fax)
peter_adolf@fd.org

Date: October 17, 2022

10

Case 3:21-cr-00086-FDW-SCR   Document 42   Filed 10/17/22   Page 10 of 10