UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:21-cr-00086-FDW-DSC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ARBAB SALEEM, | ) | ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on Defendant's Motion to Dismiss the Indictment under the Second Amendment, (Doc. No. 42), wherein Defendant argues both counts of his Indictment must be dismissed because they violate the Second Amendment under the Supreme Court's recent decision in <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S.Ct. 2111 (2022). This matter is now ripe for review. For the reasons set forth below, Defendant's Motion is **DENIED** as to both counts of the Indictment.

## I.     BACKGROUND

On April 7, 2020, law enforcement officers investigating a domestic violence between Defendant Arbab Saleem ("**Defendant**") and his girlfriend searched Defendant's residence and two locked vehicles in Defendant's driveway pursuant to a search warrant. (Doc. No. 29, p. 5; Doc. No. 45, p. 1). During this search, the officers discovered assorted firearms, ammunition, and firearm accessories, including the short-barreled shotgun and the silencer at issue in Defendant's Motion. (Doc. No. 29, p. 5–6; Doc. No. 45, p. 1; Doc. No. 42, p. 1). The short-barreled shotgun found in Defendant's bedroom was a Stevens, model 94, 16-gauge weapon for which the barrel and stock had been cut off, with an overall length of 19 and ¾ inches and a barrel length of 13 inches. (Doc. No. 29, p. 6). Defendant stated he cut the barrel off approximately three months

1

before the search.  (Id.).  Defendant explained he purchased the silencer, found in Defendant's vehicle, from "Wish.com" but had yet to affix it to a firearm, though he intended to attach it to a smaller caliber pistol.  (Id. at 5–6).  Investigators determined the silencer was "an improvised firearm silencer incorporating a fuel filter, cartridge, spring, and an outer aluminum tub having both front and rear end- caps."  (Id. at 7).  Both the firearm and the silencer lacked a serial number and National Firearms Act ("**NFA**") manufacturer's marks of identification, and Defendant did not register either with the National Firearms Registry.  (Id. at 6–7).

Defendant was indicted on March 17, 2021, for three counts of Possession of a Firearm Not Registered in the National Firearms Registration and Transfer Record ("**NFRTR**").  (Doc. No. 1).  On October 22, 2021, Defendant entered a straight up guilty plea to Counts One and Two of the Bill of Indictment, (Doc. No. 19), for knowingly possessing the unregistered short-barreled shotgun in violation of 18 U.S.C. § 921(a)(6) and 26 U.S.C.§§ 5845(a)(2), 5861(d), and 5871 (Count One), and for knowingly possessing the unregistered silencer in violation of 18 U.S.C. §§ 921(a)(3)(C) and 921(a)(24), and 26 U.S.C.§§ 5845(a)(7), 5861(d), and 5871 (Count Two).  (Doc. No. 1, p. 1).[1]

Defendant filed this Motion to Dismiss Under the Second Amendment on October 17, 2022, (Doc. No. 42), and the Supplemental Memorandum in Support on October 26, 2022 (Doc. No. 44).  The Government filed its Response to Defendant's Motion on November 11, 2022.  (Doc. No. 45).  On January 9, 2023, this Court held a hearing on Defendant's Motion, taking the parties' oral arguments under advisement.  Accordingly, this matter is ripe for review.  Thus, the Court

---

[1] The Bill of Indictment also includes a third count, for knowingly possessing a manufactured AR-15 type .223 Remington caliber firearm, not registered to Defendant in the NFRTR, in violation of 18 U.S.C. §§ 921(a)(3)(A) and 921(a)(3)(B), and 26 U.S.C. §§ 5845(a)(5), 5845(e), 58619d), and 5871.  (Doc. No. 1, p. 2).  However, the Government has indicated it will be dismissing Count Three of the Indictment.  (Doc. No. 29, p. 10).

must determine whether either count of Defendant's Indictment should be dismissed, which turns on whether both counts of Defendant's Indictment are facially constitutional under the Second Amendment in light of the Supreme Court's recent decision in <u>Bruen</u>.

## II.   STANDARD OF REVIEW

Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure establishes that a court may dismiss a defective indictment for failure to state an offense where the indictment alleges the defendant violated an unconstitutional statute.   <u>U.S. v. Price</u>, No. 2:22-cr-00097, 2022 WL 6968457, at *1 (S.D.W.Va. Oct. 12, 2022) (<u>citing</u> <u>U.S. v. Engle</u>, 676 F.3d 405, 415 (4th Cir. 2012)); <u>U.S. v. Brown</u>, 715 F. Supp. 2d 688, 689 (E.D. Va. 2010) (<u>citing</u> <u>In re Civil Rights Cases</u>, 109 U.S. 3, 8–9 (1883)); <u>U.S. v. Vandevere</u>, No. 1:19-cr-63-MOC, 2019 WL 4439483, at *1 n.1 (W.D.N.C. Sep. 16, 2019).  "To warrant dismissal of the indictment, [the defendant] would need to demonstrate that the allegations therein, even if true, would not state an offense." <u>U.S. v. Thomas</u>, 367 F.3d 194, 197 (4th Cir. 2004) (<u>citing</u> <u>U.S. v. Hooker</u>, 841 F.2d 1225, 1227–28 (4th Cir. 1988) (en banc)).

## III.   DISCUSSION

In his Motion to Dismiss, Defendant relies on <u>Bruen</u> to argue both counts of the Indictment must be dismissed because the plain text of the Second Amendment protects his conduct—the possession of short-barreled shotguns and silencers—and because there is no historical tradition supporting the regulation of his presumptively-protected conduct.  The Government, in response, contends the Second Amendment does not protect a right to bear either short-barreled shotguns or silencers.  Specifically, the Government argues <u>Bruen</u> did not impact Supreme Court precedent expressly holding that short-barreled shotguns fall outside the Second Amendment's protection.

3

Additionally, the Government asserts that silencers are not "arms" within the meaning of the Second Amendment, and even if they are, they are considered "dangerous and unusual," such that the Second Amendment does not guarantee a right to their possession. Finally, the Government argues that the NFA's requirements do not unconstitutionally infringe on Defendant's Second Amendment rights, and that the NFA's regulations are sufficiently analogous to the historical regulation of commerce in firearms to justify its regulation of silencers.

Defendant pled guilty, without the benefit of a plea agreement, to Counts One and Two of his indictment, which respectively charged Defendant with: (1) possessing an unregistered short-barreled shotgun in violation of 18 U.S.C. § 921(a)(6), 26 U.S.C. §§ 5845(a)(2), 5861(d), and 5871; and (2) possessing an unregistered silencer in violation of 18 U.S.C. §§921(a)(3)(C) and 921(a)(24), and 26 U.S.C. §§ 5845(a)(7), 5861(d), and 5871. (Doc. No. 1, p. 1). The Court will address each count of Defendant's Indictment in turn.

**A.      Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure**

At the outset, the Court must determine whether Defendant's Motion is timely under Rule 12(b) of the Federal Rules of Criminal Procedure. Defendant asserts that his Indictment must be dismissed because even taking the allegations as true, the Indictment fails to state an offense since the Second Amendment protects his conduct. Conversely, the Government contends Defendant's Motion must be denied because Defendant failed to raise his constitutional challenge prior to trial.

Rule 12(b)(3)(B)(v) provides that certain motions "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits," including motions to dismiss an indictment for failure to state an offense. FED. R. CRIM. P. 12(b)(3)(B)(v). Thus, if a motion challenging the facial constitutionality of the underlying

4

statute is not made before trial it is deemed "untimely," and a district court can only consider it if the defendant can demonstrate "good cause" for his failure to raise the issue prior to trial. FED. R. CIV. P. 12(c)(3). Where the defendant fails to make such a showing, the untimely motion is waived. U.S. v. Wagoner, No. 4:30-cr-00018, 2022 WL 17418000, at * (W.D. Va. Dec. 5, 2022) (citing U.S. v. Ojedokun, 16 F.4th 1091, 1113 (4th Cir. 2021) (motion to suppress)).

Here, Defendant raised his constitutional challenge to the Indictment on October 17, 2022, well after the Court accepted and entered his guilty plea on October 22, 2021. However, for the reasons stated during the hearing on this matter on January 9, 2023, the Court rejects the Government's argument that because Defendant's Motion was untimely, it should be denied. Given the importance of the issue before this Court, and because the Supreme Court's opinion in Bruen announced a new standard for analyzing Second Amendment claims, such as Defendant's, that "transformed and left uncharted much of the legal landscape," Price, 2022 WL 6968457, at *2 (quoting U.S. v. Charles, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *1 (W.D. Tex. Oct. 3, 2022)), the Court finds Defendant has shown good cause to consider his Motion. See Brown, 715 F. Supp. 2d at 690 (citing U.S. v. Chester, 367 F. Appx. 392 (4th Cir. 2010) vacated on rehearing on other grounds, 628 F.3d 673 (4th Cir. 2010)). Accordingly, Defendant's Motion is not barred by Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure, and the Court now turns to the merits of Defendant's claims beginning with a summary of the standard outlined in Bruen.

**B.     The Bruen Standard for Second Amendment Claims**

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In Bruen, the Supreme Court clarified the appropriate standard for

analyzing Second Amendment claims. The Supreme Court held that lower courts had been incorrect in reading precedent to require a means-end analysis in evaluating Second Amendment claims. Bruen, 142 S. Ct. at 2129. Instead, the Court explained that District of Columbia v. Heller, 554 U.S. 570 (2008), held, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms" for self-defense. Id. at 2127 (quoting Heller, 554 U.S. at 595) (emphasis in original). Further, the Supreme Court emphasized that "Heller and McDonald expressly rejected the application of any" means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." Id. at 2129 (quoting Heller, 554 U.S. at 634; see also McDonald v. City of Chicago, 561 U.S. 742, 790–91 (2010)). In place of a means-end analysis, then, the Supreme Court stated the following standard for considering Second Amendment claims:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 2129–30 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50, n.10 (1961)).

In applying Bruen's standard, courts must first address the threshold question of whether the Second Amendment's plain text protects the conduct that is being regulated. Id. at 2126, 2134. If it does, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 142 S.Ct. at 2127. This requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." Id. at 2131. Because

6

"Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," id. at 2136 (quoting Heller, 554 U.S. at 634–35) (emphasis in original), the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." Id. at 2132. Thus, in assessing "unprecedented societal concerns or dramatic technological changes" that could not have been anticipated by the Founders, "the historical inquiry that courts must conduct will often involve . . . determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation." Id. at 2132. To that end, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." Id. at 2133 (quoting McDonald, 561 U.S. at 767 (quoting Heller, 554 U.S. at 599)).

However, the Court noted that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id. at 2133. Instead, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Id.

In Bruen, the Supreme Court illustrated the application of its Second Amendment standard by breaking down its decision in Heller. Id. at 2127–28. In Heller, the Supreme Court addressed the threshold inquiry of whether the regulation implicated conduct protected by the Second Amendment by first analyzing the Amendment's plain text. The Court explained "keep and bear arms" provides for "the individual right to possess and carry weapons in case of confrontation." Id. at 592. Additionally, the Court defined "arms" under the Second Amendment as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike

7

another," which includes "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582 (internal citations omitted). Next, however, the Court noted that the right to armed self-defense was not an unlimited "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626. Rather, the Court cited its decision in U.S. v. Miller, 307 U.S. 174 (1939), "for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." Id. at 623 (citing Miller, 307 U.S. at 178). The Court emphasized Miller's holding: "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right [protected under the Second Amendment]." Id. at 625. This limit on the Second Amendment's protection is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Id. at 627.

In light of those definitions and limits to the Second Amendment's protection, the Court addressed the threshold issue and determined that the law at issue—a complete ban on the possession of handguns—did implicate conduct protected by the Second Amendment, which prompted the Court's analysis of whether the regulation was in line with the Nation's history and tradition. Id. at 628. After conducting a historical analysis, the Court concluded the Second Amendment did not support the complete ban on handguns created by the regulation at issue, and as such the regulation was unconstitutional. Id. at 636.

Finally, this Court notes that during the hearing on Defendant's Motion, Defendant argued—and the Court agrees—much of the language quoted by the Court in Bruen is dicta. It is true that courts "are not bound by dicta or separate opinions of the Supreme Court." Price, 2022

WL 6968457, at *7 (citing Myers v. Loudoun Cnty. Pub. Schs., 418 F.3d 395, 406 (4th Cir. 2005)). However, "the Fourth Circuit has repeatedly instructed that '[w]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court,' 'particularly when the supposed dicta is recent and not enfeebled by later statements.'" Id. (quoting Hengle v. Treppa, 19 F.4th 324, 347 (4th Cir. 2021) (internal citations omitted); Manning v. Caldwell, 930 F.3d 264, 281 (4th Cir. 2019) (en banc); McCravy v. Metro. Life Ins. Co., 690 F.3d 176, 181 n.2 (4th Cir. 2012) ("[W]e cannot simply override a legal pronouncement endorsed . . . by a majority of the Supreme Court.")).

In light of the standard outlined in Bruen, then, the Court will now consider the challenged statutes in Defendant's Indictment.

## C.      Statutory Framework of the National Firearms Act

The relevant part of the NFA states: "It shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d).  The NFA further provides that "[a]ny person who violates or fails to comply . . . shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both." 26 U.S.C. § 5871.  The NFA further provides:

> The term "firearm" means . . . (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; [and] . . . (7) any silencer (as defined in section 921 of title 18, United States Code) . . . .   The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

26 U.S.C.§ 5845(a).  Thus, both counts of Defendant's indictment implicate firearms regulated by the NFA: short-barreled shotguns and silencers.

9

Title 18 of the United States Code similarly provides definitions for the firearms cited in Defendant's Indictment. The term "'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer" not including an antique firearm. 18 U.S.C. §921(a)(3). A "short-barreled shotgun" is "a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(6). Finally, a "firearm silencer" includes "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer . . . ." 18 U.S.C. § 921(a)(25).

To lawfully possess the firearms identified by the NFA, the Act requires individuals to register their firearms in the NFRTR. 26 U.S.C. § 5841(b). To register, any "manufacturer, importer, [] maker" and transferor must file an application with the Secretary of the Treasury that includes: (1) the proper stamp evidencing payment of the $200 tax; (2) identification for the firearm to be registered; and (3) identification of the applicant (if the firearm is being transferred, the application must identify both the transferor and the transferee), including fingerprints and a photograph. 26 U.S.C. §§ 5811, 5812, 5821, 5822. However, the NFA establishes that the Secretary will deny an application if the making, transfer, receipt, or possession "of the firearm would place the person making the firearm [or the transferee] in violation of the law." 26 U.S.C. §§ 5812, 5822.

Here, it is undisputed that both firearms at issue fall within the definitions provided by the NFA for a short-barreled shotgun (Count One) and a silencer (Count Two). It is also undisputed that Defendant failed to register either with the NFRTR as required. However, Defendant now contends the Indictment must be dismissed because both counts violate the Second Amendment by regulating conduct that falls within its protection. Thus, this Court must determine whether, under the standard outlined in Bruen, the Second Amendment protects Defendant's right to possess either a short-barreled shotgun or a silencer as defined by the NFA. For the following reasons, the Court finds that it does not.

## D.      Short-Barreled Shotguns Under the Second Amendment

Count One of the Indictment charges Defendant with knowingly possessing a short-barreled shotgun not registered to him in the NFRTR, in violation of 18 U.S.C. § 921(a)(6), and 26 U.S.C. §§ 5845(a)(2), 5861(d), and 5871. Defendant argues the NFA's regulation of short-barreled shotguns burdens his Second Amendment rights in a way that is unsupported by this Nation's historical traditions. Specifically, Defendant contends his short-barreled shotgun falls within the meaning of "arms" under the Second Amendment and his right to possess it is therefore protected. Defendant alleges short-barreled shotguns are "weapons in common use" that existed unregulated at the time the Second Amendment was adopted, as evidenced by the blunderbuss—a short-barreled firearm in use in the 18th century.[2] In response, the Government contends Bruen

---

[2] A blunderbuss, a predecessor of the shotgun, is a muzzle-loading shoulder weapon with a flared muzzle. Blunderbuss, BRITANNICA, https://www.britannica.com/technology/blunderbuss (last visited March 1, 2023). However, the Court notes that a blunderbuss is not as close of a fit to a short-barreled shotgun as Defendant would like to believe. For example, one version of the English Blunderbuss, which "persisted in England into the early 1700's," features a barrel length of 15 ¼ inches but an overall length of 31 inches. GEORGE C. NEUMANN, THE HISTORY OF WEAPONS OF THE AMERICAN REVOLUTION 124 (1967). Another version, typically used by the navy during the same time, had a barrel length of 19 ⅞ inches and an overall length of 33 ⅞ inches. Id. Others from the mid-1700's had barrel lengths ranging from 12 ⅛ to 22 ⅞ inches, and overall lengths between 31⅛ and 39 inches. Id. at 124–28. However, the American Blunderbusses, manufactured in the Colonies during the mid- to late-1700's,

did not overturn the Supreme Court's decisions in <u>Miller</u> and <u>Heller</u>, which clearly held that the Second Amendment does not protect short-barreled shotguns.

The issue before the Court is whether the Second Amendment protects a right to bear short-barreled shotguns, which turns on <u>Bruen</u>'s impact on Supreme Court precedent speaking to this issue. Under <u>Bruen</u>, then, this Court must first determine whether the Second Amendment's plain text covers the conduct at issue. <u>Bruen</u>, 142 S.Ct. 2126. If it does, "the Constitution presumptively protects that conduct" unless the government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." <u>Id.</u>

In addressing the threshold question, the Court finds that the NFA's regulation of the conduct at issue here—the possession of a short-barreled shotgun—does not implicate conduct protected by the Second Amendment. The Supreme Court has expressly and repeatedly held that short-barreled shotguns do not fall within the scope of the Second Amendment's protections. In <u>Miller</u>, the Court determined:

> In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.

<u>Miller</u>, 307 U.S. at 178. The Court then affirmed that holding in <u>Heller</u>: "We therefore read <u>Miller</u> to say only that the Second Amendment does not protect . . . short-barreled shotguns." <u>Heller</u>, 554 U.S. at 625; <u>see also</u> <u>Thompson/Center Arms Co.</u>, 504 U.S. at 517 (emphasizing that the regulation

---

featured a barrel length of 25 ¾ inches and an overall length of 40 ⅞ inches, or a barrel length of 21 ⅞ inches and an overall length of 37 ½ inches. <u>Id.</u> at 128–30. Thus, many of these firearms, and especially those manufactured and used in America at the time of the ratification of the Second Amendment, would not qualify as short-barreled shotguns under the NFA, which covers only those with "an overall length of less than 26 inches or a barrel . . . of less than 18 inches in length." 26 U.S.C. § 5845(a)(1)–(2).

12

of short-barreled rifles "addresses a concealable weapon likely to be" used for criminal purposes); H.R. Rep. No. 1337, 83d Cong., 2d Sess., A395 (1954). Bruen did not overturn these holdings; rather, it quoted, explained, re-affirmed, and then applied them. See, e.g., Bruen, 142 S.Ct. at 2127–28, 2132, 2134–35. Thus, the Supreme Court's precedent controls and explicitly directs that the regulations governing the possession of short-barreled shotguns under which Defendant was indicted do not regulate conduct protected by the Second Amendment.

Defendant attempts to overcome this precedential hurdle by arguing short-barreled shotguns existed at the time of the Second Amendment's drafting and are in common use.[3] While Defendant correctly points out that Bruen dictates "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" Bruen, 142 S.Ct. at 2128 (quoting Heller, 554 U.S. at 627 (quoting Miller, 307 U.S. at 179)), this argument ignores the rest of Bruen's discussion of the issue. More fully, the Court stated:

> After holding that the Second Amendment protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right. We noted that, "[l]ike most rights, the right secured by *the Second Amendment is not unlimited*." . . . "From Blackstone through the 19th-century cases, commentators and courts routinely explained that *the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose*." . . . For example, we found it "fairly supported by the *historical tradition of prohibiting the carrying of 'dangerous and unusual weapons*'" that the Second Amendment protects the possession and use of

---

[3] It is unclear whether Defendant is asserting that short-barreled shotguns are in common use now, or that they were at the time of the Second Amendment's ratification. (Doc. No. 42, p. 5) ("'[T]he Second Amendment protects the possession and use of weapons that are 'in common use,' which includes short-barreled shotguns."). However, either interpretation is unpersuasive. As to the former, Defendant presents no evidence indicating short-barreled shotguns are "in common use" by law-abiding citizens for the purpose of self-defense today. As to the latter, Defendant cites the blunderbuss's use during the American Revolution as evidence that short-barreled firearms were in common use when the Second Amendment was adopted. This, however, ignores Miller's historical analysis demonstrating our Nation's history of regulating the permissible length of firearms as visible in the context of the militia. Miller, 307 U.S. at 180 ("The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length. . . ."; "Every officer and soldier shall appear . . . armed . . . with a good, clean musket . . . three feet eight inches long in the barrel. . . .").

13

webons that are "in common use at the time."

Id. at 2128 (first quoting Heller, 554 U.S. at 626–27; then quoting Miller, 307 U.S. at 179) (emphasis added) (internal citations omitted). Defendant does not attempt to challenge, and the Court does not address, the classification of a short-barreled shotgun as a dangerous and unusual weapon. In fact, the express purpose of the NFA was to regulate the making and receipt of "certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used." Thompson/Center Arms Co., 504 U.S. at 517 (highlighting the "clearly indicated congressional intent to cover under the [NFA] only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters"). Further, the firearms at issue—short-barreled shotguns— are not indisputably "'in common use' today for self-defense," as were the handguns at issue in Heller and Bruen. Bruen, 142 S.Ct. at 2134 (citing Heller, 554 U.S. at 628–29 ("The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [of self-defense].")). Rather, Congress and the Supreme Court have already determined short-barreled shotguns are dangerous and unusual weapons likely to be used not for self-defense, but for criminal purposes. Those directives control.

Thus, as the Supreme Court has already held, short-barreled shotguns do not fall within the Second Amendment's protection.[4] Accordingly, the NFA's regulation of their possession does

---

[4] This Court is not the first Court to address § 5861(d) following the Supreme Court's decision in Bruen. See, e.g., U.S. v. Rush, No. 22-cr-40008-JPG, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023) (finding § 5861(d) constitutional because precedent establishes short-barreled shotguns are dangerous and unusual weapons unprotected by the Second Amendment); U.S. v. Holton, No. 3:21-CR-0482-B, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) (holding § 5861(d) and § 5861(h) are constitutional because the NFA regulates dangerous and unusual weapons and thus does not regulate protected conduct); U.S. v. Hoover, No. 3:21-cr-22(S3)-MMH-MCR, 2022 WL 10524008 (M.D. Fla. Oct. 18, 2022) (same, § 5861(d)'s regulation of machineguns); see also U.S. v. Fencl, No. 21-CR-3101 JLS, 2022 WL 17486363 (S.D. Cal. Dec. 7, 2022) (holding the requirements under 18 U.S.C. § 3142(c)(B)(viii) of the Bail Reform Act of 1984 for § 5861(d) violations concerning unregistered short-barreled rifles and silencers regulate unprotected conduct).

14

not infringe on Defendant's Second Amendment right to keep and bear arms and further analysis into the challenged regulation is not necessary. Bruen, 2129–30. Because § 5861(d) and § 5871 do not regulate conduct protected by the Second Amendment with regard to short-barreled shotguns, the Court holds these statutes are constitutional. Therefore, Defendant's Motion to Dismiss is **DENIED** as to Count One of the Indictment.

**E.      Silencers Under the Second Amendment**

Count Two of the Indictment charges Defendant with knowingly possessing a silencer not registered to him in the NFRTR, in violation of 18 U.S.C. §§ 921(a)(3)(C) and 921(a)(24), and 26 U.S.C. §§ 5845(a)(7), 5861(d), and 5871. Defendant argues silencers fall within the protection of the Second Amendment, either as "arms" or as a reasonably necessary accoutrement that renders the firearm useful and functional. In response, the Government argues Defendant's Motion fails on the merits for four reasons: (1) silencers are not "arms" within the meaning and protection of the Second Amendment; (2) silencers are "dangerous or unusual" and thus do not receive Second Amendment protection; (3) the NFA's registration and taxation requirements do not unconstitutionally infringe on the Second Amendment right to bear arms; and (4) the Bruen standard is satisfied because the NFA is readily analogous to the Nation's history of imposing commercial regulations on firearms.

Thus, the Court must determine whether the Second Amendment protects an individual's right to keep and bear silencers. To do so, the Court must first address the threshold issue of whether the plain text of the Second Amendment covers the conduct at issue—here, the possession of silencers. The Supreme Court in Bruen affirmed its holding in Heller: "the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms,

15

shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" Bruen, 142 S.Ct. at 2134 (quoting Heller, 554 U.S. at 592). Thus, this Court must rely on the historical understanding of the Second Amendment's definition of "arms" to determine whether it extends to silencers, a "modern instrument" that "w[as] not in existence at the time of the founding." Id. at 2133.

### 1. Silencers are Not "Arms" Within the Second Amendment's Scope

As detailed above, the Supreme Court has provided ample direction on what constitutes "arms" for the Second Amendment. "The 18th-century meaning is no different from the meaning today." Heller, 554 U.S. at 581. Then, dictionaries defined "arms" as "weapons of offense, or armour of defence," and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." Id. (citing 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978); 1 A NEW AND COMPLETE LAW DICTIONARY; N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (reprinted 1989)). Today, "arms" are similarly defined as "a means (such as a weapon) of offense or defense." Arm, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/arm#:~:text=%3A%20a%20human%20upper%20limb,the%20forelimb%20of%20a%20vertebrate (last visited Feb. 2, 2023). Further, the Supreme Court held "arms" includes "all [modern] instruments that constitute bearable arms," not just those that existed when the Second Amendment was adopted. Heller, 554 U.S. at 582. Thus, to receive Second Amendment protection, the instrument must be a bearable weapon for offense or defense.

Next, the plain meaning of "keep arms" under "the Second Amendment is to have [or possess] weapons." Id. at 582. "At the time of the founding, as now, to 'bear' meant to 'carry.'" Id. at 584. When read together, to "bear arms" "refers to carrying for a particular purpose—

16

confrontation," or self-defense.  The Court explained the instrument must be one an individual could "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."  Id.; see also Bruen, 2134–35.  Therefore, the Second Amendment's right "to keep and bear Arms" protects an individual's right to carry or possess a bearable weapon for self-defense.

Attempting to fit a silencer within that definition, Defendant argues that silencers are protected because they are used to "cast[] or strike" a bullet, and as such they fall under the Second Amendment's definition of "arms."  (Doc. No. 42, p. 5–6) (citing Heller, 554 U.S. at 581, 584). However, this Court disagrees, and finds that silencers are not "bearable arms" within the meaning of the Second Amendment.

The Government cites several cases holding the Second Amendment does not guarantee any right to possess a silencer.[5]  Notably, in a case affirmed by the Fourth Circuit, the District Court for the District of Maryland held that a silencer is a firearm accessory, not a "bearable arm"

---

[5] U.S. v. Bolatete, 977 F.3d 1022 (11th Cir. 2020) ("Neither this Court nor the Supreme Court has ever held that silencers are 'typically possessed by law-abiding citizens for lawful purposes.'") (citing Heller, 554 U.S. at 625).; U.S. v. Cox, 906 F.3d 1170 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."); U.S. v. Stepp-Zafft, 733 F. App'x 327 (8th Cir. 2018) (noting other courts have rejected the argument that the Second Amendment protects silencers "on the ground that silencers are not typically possessed by law-abiding citizens for lawful purposes."); U.S. v. McCartney, 357 F. App'x 73 (9th Cir. 2009) ("Silencers, grenades, and directional mines are not 'typically possessed by law-abiding citizens for lawful purposes,' . . . [and] are therefore not protected by the Second Amendment."); Kaszycki v. U.S., No. C19-1943 RSM, 2020 WL 2838598 (W.D. Wash. June 1, 2020) (holding that silencers fall outside the Second Amendment's protection); U.S. v. Al-Azhari, No. 8:20-cr-206-T-60AEP, 2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ("The Court finds that a silencer is not a bearable arm within the meaning of the Second Amendment."); U.S. v. Grey, No. CR 18-00412-CAS-1, 2018 WL 4403979 (C.D. Cal. Sept. 13, 2018) (citing McCartney, 357 F. App'x, at 76, to uphold the defendant's indictment because the Second Amendment does not protect "'dangerous and unusual weapons' such as silencers."); U.S. v. Perkins, No. 4:08CR3064, 2008 WL 4372821 (D. Neb. Sept. 23, 2008) (rejecting the defendant's challenge to the NFA's regulation of silencers because they "are not in common use by law-abiding citizens for lawful purposes" and are therefore unprotected); U.S. v. Garnett, No. 05-CR-20002-3, 2008 WL 2796098 (E.D. Mich. July 18, 2008) (holding that "[N]othing in [Heller], however, casts doubt on the constitutionality of federal regulations [in the NFA] over the machineguns and silencers at issue in this case.").

17

within the meaning of the Second Amendment. U.S. v. Hasson, No. GJH-19-96, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019), *aff'd* 26 F.4th 610 (4th Cir. 2022). There, the court considered expert testimony to conclude:

> The evidence showed that a silencer, which is also referred to as a muffler or a suppressor, is a device that is attached to a firearm for the primary purpose of reducing the firearm's sound signature. Ms. Gillis testified that, in general, silencers can reduce a firearm's sound signature by anywhere between 2 to 35 decibels. Mr. O'Kelly testified, however, that it is unlikely that a silencer will completely eliminate the sound of a gunshot unless the firearm is particularly small or the silencer is particularly large. Silencers can be commercially-manufactured or homemade from common household items such as soda bottles, magnesium light flashlights, or oil filters, but Ms. Gillis explained that the commercial silencers typically cause a larger sound reduction than homemade silencers.
>
> Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder. Mr. O'Kelly testified that "you can't hurt anybody with a silencer unless you hit them over the head with it." Rather, based on his conversations with gun owners, Mr. O'Kelly testified that the primary reasons for owning a silencer are hearing protection and courtesy to others.[6]

Id. Based on this, the court found that "[a] silencer is not itself used 'to cast at or strike another,' it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose." Id. Further, the court explained that "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm," such that "it is not a weapon in and of itself." Id. Accordingly, the court held that a silencer is no more a bearable arm than "a shoe or a baseball bat, which, most would agree, are not arms protected by the Second Amendment." Id. at *5 n.5. This Court agrees with the Maryland District Court's holding and likewise determines that silencers, because they are not independently operable and do not serve any central self-defense

---

[6] The Court notes that during the hearing on this Motion, both parties agreed that it was not necessary to have an expert witness testify concerning the operability, necessity, or effect of silencers on the use of firearms.

purpose, are not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection.

As an alternative argument, Defendant asserts that even if silencers are not considered "arms," they nevertheless qualify for Second Amendment protection because they are reasonably necessary accoutrements that render a firearm useful and functional. This is so, Defendant argues, because "arms" at the founding included not just the firearm itself, but also "proper accoutrements that rendered that firearm useful and functional." (Doc. No. 42, p. 6) (quoting Miller, 307 U.S. at 182). "Accoutrements" at that time included equipment such as brushes and wires used to clean the firearm, holsters, and wax to protect it from the rain. Thus, because silencers protect users' ears from firearm's potentially dangerous sound levels and the CDC recommends their use in shooting ranges, Defendant argues they are "reasonably necessary" such that they receive Second Amendment protection.[7] During the hearing on this issue, Defendant likened silencers to cleaning equipment and bullets. However, the Court finds this argument unpersuasive.

Cleaning equipment, bullets, and materials that provide a firearm with protection from the elements are all necessary to render a firearm functional, whereas silencers serve no such core purpose. Without proper cleaning and repair equipment, protective materials, and ammunition, a firearm is nothing more than a paper weight and is no more of a bearable arm than a baseball bat. These accoutrements are thus critical to the use and effectiveness of a firearm as a bearable

---

[7] Defendant provides a brief history on the invention and early application of silencers, noting that silencers were "intended to enhance the shooting experience" and that Theodore Roosevelt "was a fan" of their use because he "felt it best not to wake the neighbors." (Doc. No. 42, p. 7) (quoting Emily Rupert, Suppressors: The History, NRA BLOG, https://www.nrablog.com/articles/2016/10/history-of-suppressors/ (Oct. 5, 2016)). While this presents a charming illustration, it supports the Court's finding above: silencers enhance the user's experience, but they are not necessary to make a firearm useful or functional, and as such are not protected by the plain text of the Second Amendment. Further, Defendant's historical discussion of the early use of silencers is somewhat darkened by the Government's explanation that almost immediately after their invention, society, state legislatures, and manufacturers themselves considered silencers to be dangerous and an aid to criminal activity that required regulation. (Doc. No. 45, p. 5).

19

weapon, allowing them to serve their purpose as weapons of self defense such that restrictions may run afoul of the Second Amendment. See Hasson, 2019 WL 4573424, at *5 (citing Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) (holding firing ranges are constitutionally protected); Ass'n of N.J. Rifle * Pistol Clubs v. AG N.J., 910 F.3d 106 (3d Cir. 2018) (holding ammunition as a category is protected); Jackson v. City and Cnty. of San Francisco, 746 F.3d 953 (9th Cir. 2014) (same)). These accessories are protected because without them, firearms would be neither useful nor functional. Instead, they would fall into disrepair and inoperability, precluding their protected use for self-defense. However, the same cannot be said of a silencer; "a firearm remains an effective weapon without a silencer of any type attached." Id. The use of a silencer is in no way necessary to the effective use of a firearm—it certainly has benefits for the user, but unlike cleaning materials or bullets, a firearm can be used safely and effectively without a silencer.

Thus, while Defendant attempts to point to the Nation's history and tradition of protecting accoutrements and accessories that are reasonably necessary to make a firearm operable, useful, and functional to demonstrate that silencers are similarly protected under the Second Amendment, this argument fails. A firearm is effective as a weapon of self-defense without the use of a silencer, but the reverse is not true; a silencer serves no purpose without a firearm. Thus, silencers are neither arms nor reasonably necessary accoutrements within the purview of the Second Amendment, and the NFA's regulations of silencers do not run afoul of its protections. However, even if the Court were to conclude that silencers were either "arms" or reasonably necessary accoutrements within the meaning of the Second Amendment, they still would not be protected because they are "dangerous and unusual." Heller, 554 U.S. at 627.

### 2. Silencers are "Dangerous and Unusual"

As explained above, Bruen underscored Heller's holding that not all weapons are protected by the Second Amendment: "the right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Bruen, 142 S.Ct. at 2128 (citing Heller, 554 U.S. at 627). Rather, it is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual' weapons that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" Id.

As outlined above, in enacting the NFA, Congress sought to regulate "certain weapons[8] likely to be used for criminal purposes." Thompson/Center Arms Co., 504 U.S. at 517; see also H.R. Rep. No. 1337, 83d Cong., 2d Sess., A395 (1954). As the Supreme Court has already explained, by including silencers within the NFA's ambit, and by later amending the statutory definition of silencers to "help to control the sale of" silencers and silencer kits, Congress determined silencers are "modern and lethal weapons" that are "likely to be used for criminal purposes." Thompson/Center Arms Co., 504 U.S. at 517. Accordingly, silencers fall into the category of "dangerous and unusual weapons" and are outside the scope of the Second Amendment's protection.

In summary, Defendant's argument that the Second Amendment protects silencers fails for three reasons: they are not "arms," they are not necessary to the effective use of protected "arms," and they are "dangerous and unusual." Under Bruen, courts must only address the history and

---

[8] The NFA does define the term "firearm" to embrace different types of weapons, including firearm silencers. 26 U.S.C.§ 5845(a)(7); see also 18 U.S.C. § 921(a)(3)(C). However, this statutory definition of a firearm does not establish that silencers are "bearable arms" within the definition of the Second Amendment. Rather, the statutory and the constitutional definitions of "arms" are two separate classifications. Thus, for the reasons outlined above, the Court finds that while a silencer is a "firearm" under the statutory definition, it is not an "arm" under the constitutional definition.

tradition of a firearm regulation where the Second Amendment's plain text covers the individual's conduct. Bruen, 142 S.Ct. at 2129–30. Here, however, the Second Amendment's plain text does not protect Defendant's conduct: the possession of a silencer. As such, the Court need not reach the historical inquiry. Because the NFA's regulation of silencers in §§ 5845(a)(7) and 5861(d) does not run afoul of Defendant's Second Amendment rights, his Motion to Dismiss Count Two of his Indictment is **DENIED**.[9]

### IV.  CONCLUSION

The Court finds Defendant's argument—that both counts of his Indictment must be dismissed as unconstitutional under Bruen because the Second Amendment protects a right to possess short-barreled shotguns and silencers—without merit. As explained above, neither short-

_____

[9] While the Court does not reach the historical inquiry here, the Court notes that based on the record, it appears the NFA's registration and taxation requirements are of the type that the Supreme Court in Bruen determined were permissible. Writing for the majority, Justice Thomas stated, "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." Bruen, 142 S.Ct. at 2138 n.9. Those schemes may "require applicants to undergo a background check or pass a firearms safety course" if they establish "narrow, objective, and definite standards" for licensing officials without requiring a special need other than self-defense. Id.; see also id. at 2162 (Kavanaugh, J., concurring).

Similarly, the NFA requires the payment of a $200 tax, identification of the firearm, and identification of the applicant, including fingerprints and a photograph. 26 U.S.C. §§ 5811, 5812, 5821, 5822. It does not require any special need to receive a permit, and Defendant does not provide any support for his assertion that it grants open-ended discretion and lacks objective standards. Instead, the NFA grants only one exception to its licensing requirement—for "antique firearm[s] or any device[s] . . . which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." 26 U.S.C. § 5845(a). Further, the only permissible reason for denying an application is where its approval "would place the [possessor] in violation of the law." 26 U.S.C. §§ 5812, 5822. This is far from open-ended discretion, nor is it contrary to the Second Amendment, which protects only "law-abiding, responsible citizens." Heller, 554 U.S. at 635. Finally, unlike the statute at issue in Bruen, the NFA is not a complete ban on the possession of a protected Second Amendment bearable arm.

While Defendant argues the $200 tax and lengthy wait times for registration impermissibly burden constitutional rights, Defendant does not provide any evidence to demonstrate either how long the application process takes, or that the $200 tax is "exorbitant," such that they "deny ordinary citizens" their Second Amendment right. Bruen, 142 S.Ct. at 2138 n.9. Accordingly, these arguments fail, and the Court finds that based on the record before it, the NFA's regulation of short-barreled shotguns and silencers does not impermissibly burden a Second Amendment right. Rather, it operates to ensure that those who possess dangerous and unusual firearms—weapons outside the Second Amendment's protection—"are, in fact, law-abiding, responsible citizens." Heller, 554 U.S. at 635.

22

barreled shotguns nor silencers are considered "arms" within the meaning of the Second Amendment. Accordingly, the Second Amendment's plain text does not protect Defendant's conduct, so the NFA's regulations on short-barreled shotguns and silencers do not run afoul of Defendant's constitutional rights. Therefore, Defendant's Motion to Dismiss the Indictment Under the Second Amendment, (Doc. No. 42), is **DENIED** as to both Count One and Count Two of the Indictment.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss the Indictment under the Second Amendment, (Doc. No. 42), is DENIED.

IT IS SO ORDERED.

Signed: March 1, 2023

Frank D. Whitney
United States District Judge